UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
        :
COLONY INSURANCE COMPANY,    :
        :
                      Plaintiff,   :
        :        15-CV-3896 (VSB)
      - against -     :
        :        **OPINION & ORDER**
AIG SPECIALTY INSURANCE COMPANY, :
        :
                      Defendant.  :
        :
---------------------------------------------------------X

Appearances:

James Walsh
London Fischer, LLP
New York, New York

Nancy Tordai
Peters & Nye, LLP
South Barrington, Illinois
*Counsel for Plaintiff*

Robert Novack
Bressler, Amery & Ross, PC
New York, New York

Jordan E. Mintz
Michael D. Margulies
Bressler, Amery & Ross, PC
Florham Park, New Jersey
*Counsel for Defendant*

VERNON S. BRODERICK, United States District Judge:

      Plaintiff Colony Insurance Company ("Colony") initiated this action on May 20, 2015 against AIG Specialty Insurance Company ("AIG"), alleging that AIG failed to honor its obligations under the Insurance Company Professional Liability Insurance Policy No. 01-424-48-29 (the "Policy"). Before me are the motions for summary judgment of AIG, (Doc. 36), and Colony, (Doc. 45). For the following reasons, Defendant's motion is GRANTED and Plaintiff's

motion is DENIED. Additionally, because I find oral argument unnecessary for decision on these motions, Colony's request for oral argument, (Doc. 42), is DENIED.

## I. Background[1]

### A. *The Policy*

AIG issued the Policy—under which Colony is an insured—to Argo Group International Holdings, Ltd. (Def.'s 56.1 ¶¶ 2–3.)[2] The Policy provides coverage for damages resulting from a claim for a "Wrongful Act" in the rendering of, or failure to render, Professional Services, when that claim is made against Colony and reported to AIG during the October 1, 2013 through October 1, 2014 coverage period, and promises payment of "Defenses Costs, Charges, and Expenses" on Colony's behalf. (*Id.* ¶ 4; Pl.'s 56.1 ¶¶ 2, 4.)[3] Specifically, the Policy states that AIG agrees:

> To Pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages resulting from any claim or claims first made against the Insured and reported to the Company during the Policy Period for any Wrongful Act of the Insured or of any other person for whose actions the Insured is legally responsible, but only if such Wrongful Act occurs prior to the end of the Policy Period and occurs solely in the rendering of or failure to render Professional Service.

(Policy, Endorsement #25; *see also id.* at 1 ¶ 1.)[4] The Policy further states, with respect to "Defense Costs, Charges and Expenses" that:

> With respect to any such Wrongful Act for which insurance is afforded by

---

[1] The facts in the Background section, which are based on Defendant's Rule 56.1 Statement, (Doc. 38), Plaintiff's Counter-Statement thereto, (Doc. 51), and Defendant's Response to Plaintiff's Counter-Statement, (Doc. 56); Plaintiff's Rule 56.1 Statement, (Doc. 41) and Defendant's Counter-Statement thereto, (Doc. 53); and supporting materials, are undisputed unless otherwise noted.

[2] "Def.'s 56.1" refers to Defendant's Rule 56.1 Statement of Undisputed Material Facts in Support of its Cross-Motion for Summary Judgment, filed January 23, 2017. (Doc. 38.)

[3] "Pl.'s 56.1" refers to Colony Insurance Company's Rule 56.1 Statement of Material Undisputed Facts in Support of its Motion for Summary Judgment, filed January 23, 2017. (Doc. 41.)

[4] "Policy" refers to the Policy, attached as Exhibit A to the Affidavit of R. Wade Vandiver Submitted in Support of Colony's Motion for Summary Judgement. (Doc. 47-1.)

2

this policy under Insuring Agreement 1. above, the Company shall, as part
of and subject to the limit of liability, pay on behalf of the Insured Defense
Costs, Charges and Expenses.

(Policy 1 ¶ 2.) "Professional Services" is defined as "services rendered or required to be rendered solely in the conduct of the Insured's claims handling and adjusting, risk management, safety engineering," and the like, and "Wrongful Act" is defined as "any breach of duty, neglect, error, misstatement, misleading statement, omission or other act done or wrongfully attempted." (*Id.* at 2 ¶¶ 5, 7; *see also id.*, Endorsement #11.) The term "claim" is not defined in the Policy. (Pl.'s 56.1 ¶ 8.)

Because the Policy is a claims-made policy, it expressly limits liability as follows:

> EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS LIMITED GENERALLY TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED AND REPORTED IN WRITING TO THE COMPANY WHILE THE POLICY IS IN FORCE.

(Policy 1.) The Policy also contains certain exclusions. For example, the Policy does not apply to Colony's contractual obligation to pay policy proceeds owed under insurance policies that are issued by Colony. (*See* Pl.'s 56.1 ¶¶ 9–10; Policy 4, Exclusion (u) ("This policy does not apply . . . to . . . (3) any liability or obligation, whether real or alleged, assumed by the Insured as an insurer or reinsurer under any policy, binder, certificate, contract, cover note, agreement or treaty of insurance, reinsurance, suretyship, annuity, or endowment . . . .").)

Additionally, in connection with claim reporting, the Policy provides that:

> The Insureds shall, as a condition precedent to the obligations of the
> Company under this policy, give written notice to the Company of a claim
> as soon as practicable after the claim is reported to or first becomes known
> by the entity named . . . .

(Pl.'s 56.1 ¶ 11; Policy, Endorsement #14.) Separately, the Policy provides a special reporting clause for situations where the Insured becomes aware of any occurrence that may "reasonably

3

be expected to give rise to a claim." (Policy 5 ¶ 4.) The Policy further provides that "[n]o action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with all terms of this policy." (*Id.* at 6 ¶ 4.)

B.     *The Schlup Actions*

Colony issued a commercial general liability policy to Schlup Investment, Inc. ("Schlup"), with an effective coverage period of December 24, 2003 through June 22, 2004 and a $2 million limit of liability. (Pl.'s 56.1 ¶ 12.) On October 13, 2009, Plaza Gardens on the Lake Condominium Association ("Plaza Gardens") filed a construction defect lawsuit against Schlup and Michael Schlup (the "Schlup Insureds") and other defendants (the "2009 Lawsuit"). (*Id.* ¶ 13.) Colony received a copy of the Second Amended Petition in the 2009 Lawsuit on February 15, 2013, received the Third Amended Complaint on August 8, 2013, and informed the Schlup Insureds that no coverage existed on August 9, 2013. (*Id.* ¶¶ 14, 15.)

On September 13, 2013, Thomas Dickerson, counsel for the Schlup Insureds, forwarded a September 13, 2013 letter that he received from Plaza Gardens that outlined the combined policy limits and stated that $7 million of the $9 million settlement demand had already been tendered by three other insurers. (*Id.* ¶¶ 16–17.) In bolded and underlined language, Dickerson's September 13, 2013 letter (the "September 2013 Demand Letter") stated as follows:

> **We received the attached letter from Plaintiffs' counsel offering to settle this matter for Colony's aggregate policy limits of $2,000,000.00 (Exhibit A attached). My clients hereby demand that Colony offer and pay its aggregate policy limits of $2,000,000.00 on this claim to Plaintiffs to fully and finally resolve the claim against its insured. . . . If Colony fails to offer and pay its aggregate policy limits, my client will proceed with resolving this case with Plaintiffs and proceeding with a lawsuit along with Plaintiffs to collect any excess judgment rendered at trial, which we fully expect to be in excess of $15,000,000.00.**

4

(September 2013 Demand Letter 1 (emphasis in original).)[5] The letter further detailed the attempts to follow up with Colony with regard to Schlup's claim, which were purportedly ignored by Colony. (*Id.* at 1–2.) The letter then asserted:

> [I]t is apparent . . . from the manner in which this matter has been handled, the correspondence that I have received, and the lack of prior communication on this claim, that Colony has not fully investigated this loss, has failed to timely communicate with its insured regarding the loss, has failed to timely provide requested documents . . ., has ignored an order of the Court to attend mediation, and has repeatedly ignored requests for status updates on the investigation.

(*Id.* at 2.) After describing Colony's alleged wrongdoing, the letter stated that "[i]f Colony fails to meet the Plaintiffs' policy limits demand, I have no doubt that discovery will reveal even more evidence that Colony has acted in bad faith in the handling of my client's claim." (*Id.*)

Dickerson then went on to describe in the letter the damages that Plaza Gardens would introduce at trial, and reminded Colony of its fiduciary duty and contended that "[w]here an insurer wrongfully breaches this duty and refuses to settle within policy limits, the insurer may be held liable for resulting losses to the insured." (*Id.*) The letter pointed out that Colony was the only insurance company out of four carriers that refused to pay its aggregate limits, that the other carriers, by paying, have "insulated themselves from a subsequent bad faith lawsuit," and that if Colony refused to pay its limits, this "will be the entire reason why this matter is not settled." (*Id.* at 3.) Dickerson warned that if Colony fails to fulfill its duties and pay the policy limits on the claim, the Schlup Insureds "will be forced to enter into an agreement with Plaintiffs to protect [themselves] from an excess judgment, and restrict collection of any judgment to proceeds from a lawsuit against Colony for bad faith and equitable garnishment." (*Id.*)

---

[5] "September 2013 Demand Letter" refers to the September 13, 2013 Letter from The Dickerson Law Firm to Mike Weinstein at Colony, attached as Exhibit C to the Affidavit of R. Wade Vandiver Submitted in Support of Colony Insurance Company's Motion for Summary Judgment. (Doc. 47-3.)

5

On September 17, 2013, Dickerson sent another letter to Colony, in which he referenced a telephone call from earlier that day, stated that he had been "completely ignored until recently," responded to some of Colony's "concerns," and renewed the "**demand that Colony offer and pay its aggregate policy limits**" while noting again that "**[i]f Colony fails to offer and pay its aggregate policy limits, [the Schlup Insureds would] proceed with resolving [the] case with Plaintiffs and proceed[] with a lawsuit along with Plaintiffs to collect any excess judgment rendered at trial, which we fully expect to be in excess of $15,000,000.00.**" (Doc. 47-4 (emphasis in original).) Colony responded by email dated September 19, 2013, stating its view that Dickerson's letter had not substantiated any of the points discussed and that Colony's position would "remain as outlined in our coverage position letter dated 8/7/13." (Doc. 47-5.) Dickerson then responded on September 19, 2013, with his final letter to Colony. (Doc. 47-6.) That letter renewed the prior demand, detailed "the way in which [the] claim was handled," contended that Colony had engaged in "a rushed coverage determination literally conducted in one morning," and addressed Colony's concerns. (*Id.*) Colony did not receive any further communication from Dickerson on behalf of the Schlup Insureds, and closed its file with respect to the 2009 Lawsuit on November 19, 2013. (Pl.'s 56.1 ¶ 20.)

The Schlup Insureds entered into a settlement agreement with Plaza Gardens on October 1, 2013, which, among other things, dismissed Schlup without prejudice (the "Schlup Settlement Agreement"). (Def.'s 56.1 ¶ 27; Doc. 39-11.) The Schlup Settlement Agreement set forth Plaza Gardens and the Schlup Insureds' beliefs that Colony "unfairly, and inaccurately denied coverage" and that Colony's refusal to provide coverage was "unfounded, unreasonable, in violation of the Colony Policy, and in bad faith." (Doc. 39-11, at 1, 2.) It also assigned to plaintiffs in the 2009 Lawsuit any action or claim Schlup had or may have against Colony "for

6

breach of contract, bad faith, or any other causes of action arising out of the refusal by Colony to defend and settle the claims." (*Id.* at 4.)

On January 9, 2014, Plaza Gardens commenced a second lawsuit against Schlup (the "2014 Lawsuit"). (Def.'s 56.1 ¶ 33.) Consistent with the Schlup Settlement Agreement, Schlup did not defend itself in the 2014 Lawsuit. (*Id.* ¶ 34.) Although Colony acknowledges that the 2014 Lawsuit identified the construction defects set forth in the 2009 Lawsuit, it maintains that the 2014 lawsuit made new, additional, and different factual allegations. (Def.'s Counter 56.1 ¶ 23.)[6] AIG disputes Colony's characterization of the 2014 Lawsuit, and contends that the 2009 Lawsuit and 2014 Lawsuit arise out of the same factual circumstances. (*Id.*) In any event, on January 23, 2014, counsel for the Schlup Insureds put Colony on notice of the 2014 Lawsuit and demanded defense and indemnity. (Pl.'s 56.1 ¶ 22.) On April 4, 2014, Colony informed Schlup that no coverage existed for the 2014 Lawsuit. (*Id.* ¶ 24.) Within days of sending this letter, Colony filed a separate lawsuit for declaratory relief on April 14, 2014 against Michael Schlup, Schlup, Plaza Gardens, and other unknown persons or entities, requesting that the court declare that Colony had no duty to provide indemnification for either the 2009 or 2014 Lawsuits. (*Id.* ¶ 25.) The Schlup Insureds moved to stay the lawsuit to avoid adjudication of the same facts at issue in the 2014 Lawsuit. (*Id.* ¶ 27.) The 2014 Lawsuit proceeded to a bench trial on July 15, 2014, which resulted in Plaza Gardens obtaining a judgment against Schlup for $20,153,878.87 plus interest. (Def.'s 56.1 ¶ 35.) Schlup did not object to the damages award. (*Id.* ¶ 36.)

On July 28, 2014, Colony's counsel received a July 23, 2014 letter from Schlup's counsel demanding that Colony pay the $20,153,878.87 judgment. (Pl.'s 56.1 ¶ 28.) A few days later,

---

[6] "Def.'s Counter 56.1" refers to Defendant's Response to Plaintiff's Rule 56.1 Statement of Undisputed Material Facts, filed February 17, 2017. (Doc. 53.)

7

on July 31, 2014, Colony received a copy of Plaza Gardens' motion to dismiss Colony's declaratory judgment lawsuit, which included a copy of an unfiled garnishment complaint that Plaza Gardens stated had already been filed. (*Id.* ¶ 30.) On August 4, 2014, Plaza Gardens and Schlup sued Colony for equitable garnishment, bad faith, and breach of fiduciary duty (the "Garnishment Action"). (Doc. 39-15.) The Garnishment Action sought to recover $20,153,878.87 plus interest. (Def.'s 56.1 ¶ 38.) In addition, the complaint in the Garnishment Action alleged that the $20,153,878.87 judgment Plaza Gardens and Schlup sought to recover was the result of Colony's bad faith refusal to defend and settle the 2009 Lawsuit and its bad faith denial of coverage and defense for the 2014 Lawsuit. (Pl.'s 56.1 ¶ 31.) The Garnishment Action was settled for $5 million on March 16, 2015, which included the uninsured $2 million of the Schlup policy. (Def.'s 56.1 ¶ 40; Pl.'s 56.1 ¶ 51.) The parties dispute whether the Garnishment Action, the 2014 Lawsuit, and the 2009 Lawsuit were treated by Colony as a single claim; however, Colony does not dispute that file for the 2009 Lawsuit was reopened upon receipt of the 2014 Lawsuit because the lawsuits involved the same construction project. (Pl.'s Counter 56.1 ¶ 42)[7] In addition, while Colony maintains that it assigned separate file numbers to the Garnishment Action, the 2014 Lawsuit, and the 2009 Lawsuit, (*id.*), Colony's claim notes indicate that it entered notes with respect to the September 2013 Demand Letter, the 2014 Lawsuit, and the Garnishment Action under the same claim number, (Novack Decl. Ex. G).[8]

---

[7] "Pl.'s Counter 56.1" refers to Colony's Rule 56.1 Response to AIG's Rule 56.1 Statement of Material Undisputed Facts and Colony's Rule 56.1 Statement of Additional Undisputed Facts Requiring the Denial of AIG's Motion for Summary Judgment, filed February 17, 2017. (Doc. 51.)

[8] "Novack Decl." refers to the Declaration of Robert Novack, filed on January 23, 2017. (Doc. 39.)

8

### C. *AIG's Denial of Colony's Claim*

The July 23, 2014 demand was first reported to Colony's Complex Claims Litigation Director on August 1, 2014, and Colony notified AIG of the July 23, 2014 demand on August 20, 2014. (Pl.'s 56.1 ¶¶ 36–37.) A copy of the complaint in the Garnishment Action was subsequently provided to AIG. (*Id.* ¶ 38.) Colony's "extra-contractual" claim, related to the 2014 demand, concerns alleged wrongful acts by Colony in providing, or failing to provide, professional services. (*Id.* ¶ 39; *see also id.* ¶ 33.) On September 15, 2014, AIG reserved its rights with respect to coverage and requested information from Colony. (*Id.* ¶ 40.) On April 6, 2015, Colony demanded that AIG pay the settlement and defense costs that were above the Policy's retention amount, and AIG refused to pay. (*Id.* ¶¶ 54–55.)

## II. <u>Procedural History</u>

On May 20, 2015, Plaintiff commenced this action by filing its complaint. (Doc. 1.) Defendant submitted its answer on July 17, 2015, (Doc. 12), and after granting an adjournment request, I held an initial pretrial conference on September 10, 2015, (*see* Doc. 16). The parties requested multiple extensions of the discovery deadlines and, on October 13, 2016, Plaintiff filed a pre-motion letter requesting a pre-motion conference concerning its anticipated motion for summary judgment, (Doc. 29), to which Defendant responded on October 18, 2016, noting that it was "in complete agreement that the facts material to the determination of coverage are undisputed" and requesting to file a cross-motion for summary judgment, (Doc. 30). Therefore, on December 22, 2016, I held a pre-motion conference regarding the parties' anticipated cross-motions for summary judgment. (*See* Dkt. Entry Dec. 22, 2016.)

In accordance with the deadlines set at the pre-motion conference, Plaintiff filed its motion for summary judgment on January 20, 2017, (Docs. 34, 45–48), as did Defendant, (Docs.

35, 36–39). Plaintiff and Defendant filed their oppositions on February 17, 2017, (Docs. 49–51, 52–53), and their replies on March 3, 2017, (Doc. 55, 58). Plaintiff further requested leave to file a sur-reply in connection with Defendant's cross-motion for summary judgment, (Doc. 59), and on March 15, 2017, I denied Plaintiff's request, (Doc. 61).

### III. Legal Standard

Summary judgment is appropriate when "the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see* Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine[]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at 256, and to present such evidence that would allow a jury to find in his favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000). "The same standard applies where, as here, the parties file[] cross-motions for summary judgment . . . ." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inference must be drawn against the party whose motion is under consideration." *Id.*

(citations omitted.)

To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

Additionally, in considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (citations and internal quotation marks omitted); *see also Matsushita*, 475 U.S. at 587. "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

**IV.    Discussion**

   **A.    *Choice of Law***

As subject matter jurisdiction in this case is premised upon the diversity of citizenship of the parties, I must determine which substantive state law governs the analysis. Here, Plaintiff and Defendant both cite primarily to New York law, with Plaintiff even criticizing Defendant's citation to non-New York law, (*see* Pl.'s Opp. 15),[9] and Plaintiff asserts that New York law applies to the interpretation of the Policy, (Pl.'s Mem. 10).[10] Therefore, I apply New York law to interpret the Policy. *See Checkrite Ltd. v. Ill. Nat'l Ins. Co.*, 95 F. Supp. 2d 180, 188 (S.D.N.Y. 2000) (applying New York law based upon the parties' implicit consent thereto).

   **B.    *Interpretation of Insurance Policies***

Insurance policies are contracts and as such "must be construed to effectuate the intent of the parties as derived from the plain meaning of the policy's terms." *Andy Warhol Found. for the Visual Arts, Inc. v. Fed. Ins. Co.*, 189 F.3d 208, 215 (2d Cir. 1999) (citation omitted). Thus, so long as the policy's language is unambiguous with respect to the issue raised by the parties, the policy is applied according to its terms. *Id.* However, "[a]n insurance contract is ambiguous where its terms 'could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Quanta Lines Ins. Co. v. Inv'rs Capital Corp.*, No. 06 Civ. 4624(PKL), 2009 WL 4884096, at *9 (S.D.N.Y. Dec. 17, 2009) (quoting *Int'l Multifoods Corp.*

---

[9] "Pl.'s Opp." refers to Colony's Memorandum of Law in Opposition to AIG's Motion for Summary Judgment, filed February 17, 2017. (Doc. 49.)

[10] "Pl.'s Mem." refers to Colony's Memorandum of Law in Support of Motion for Summary Judgment, filed January 24, 2017. (Doc. 46.)

12

*v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)), *aff'd sub nom. Quanta Specialty Lines Ins. Co. v. Inv'rs Capital Corp.*, 403 F. App'x 530 (2d Cir. 2010). "The language of a contract is not made ambiguous simply because the parties urge different interpretations." *Id.* (quoting *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)). If the language is ambiguous, a court may look outside the policy to extrinsic evidence demonstrating the parties' intent and, if that fails, apply other rules of contract construction, including the rule of contra proferentum, which provides for ambiguities to be construed in favor of the insured. *See id.* (citing *Morgan Stanley Grp. Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 276 (2d Cir. 2000)). "If the ambiguities can be resolved through a legal construction of the policy terms, rather than a factual one, summary judgment may be appropriate even where the policy is ambiguous." *Checkrite*, 95 F. Supp. 2d at 189 (citing *Andy Warhol*, 189 F.3d at 215).

### C. *Defining "Claim" in the Policy*

The parties here do not contend that the Policy is ambiguous with respect to when a claim is being made, but rather focus on the proper definition of the term "claim" as used in the Policy. Indeed, according to Colony, the term "claim," as used in liability insurance policies under New York law, is "unambiguous." (Pl.'s Mem. 12.) When addressing the meaning of the term "claim" in the context of an insurance policy where the term is not defined in the policy itself, courts in the Second Circuit have considered the question of when a claim was made to be ambiguous, but have nevertheless deemed the matter appropriately resolved on summary judgment by applying the definition of "claim" gleaned from the case law. *See, e.g.*, *Andy Warhol*, 189 F.3d at 215; *Checkrite*, 95 F. Supp. 2d at 190; *Home Ins. Co. v. Spectrum Info. Techs., Inc.*, 930 F. Supp. 825, 846 (E.D.N.Y. 1996) ("Courts have found that the term 'claim' as used in liability insurance policies is unambiguous and generally means a demand by a third

13

party against the insured for money damages or other relief owed."); *but see In re Ancillary Receivership of Reliance Ins. Co.*, 863 N.Y.S.2d 415, 418 (1st Dep't 2008) (finding the failure of the policy to provide a definition of the term "claim" to present an ambiguity), *aff'd*, 12 N.Y.3d 725 (N.Y. 2009).

"[U]nder New York law, a claim is an assertion by a third party that in the opinion of that party the insured may be liable to it for damages within the risks covered by the policy." *Travelers Indem. Co. v. Northrop Grumman Corp.*, 677 F. App'x 701, 705 (2d Cir. 2017) (internal quotation marks omitted) (summary order); *see also Rockland Exposition, Inc. v. Great Am. Assurance Co.*, 746 F. Supp. 2d 528, 541–42 (S.D.N.Y. 2010) ("[A] 'claim' is simply 'an assertion by a third party that in the opinion of that party the insured may be liable to it.'" (quoting *Am. Ins. Co. v. Fairchild Indus., Inc.*, 56 F.3d 435, 439 (2d Cir. 1995))), *aff'd*, 445 F. App'x 387 (2d Cir. 2011); *Checkrite*, 95 F. Supp. 2d at 190 ("The term 'claim' as used in liability insurance policies has generally been found by courts to be an unambiguous term that means a demand by a third party against the insured for money damages or other relief owed."). According to some courts, a claim must also "relate to an assertion of legally cognizable damage, and must be a type of demand that can be defended, settled and paid by the insurer." *Travelers Indem.*, 677 F. App'x at 705 (quoting *Fairchild*, 56 F.3d at 439).[11]

---

[11] AIG disputes whether the more restrictive definition of "claim" tied to "demands" that "can be defended, settled and paid by the insurer," is applicable, (Def.'s Opp. 1), although it contends that the September 13 Demand Letter constitutes a claim even under the more restrictive definition, (Def.'s Reply 3–9). Notably, the Second Circuit in its summary order in *Travelers Indemnity.* did not appear to definitively adopt the more restrictive definition, but instead used this language when citing case law where the term "claim" had actually been defined in the policy at issue to include such language. *See Travelers Indem.*, 677 F. App'x at 705 (quoting *Fairchild*, 56 F.3d at 439). At the same time, the Second Circuit has at least recognized that "[c]aselaw [outside of Vermont] indicates that the plain and ordinary meaning of 'claim' is 'a demand for specific relief owed because of alleged wrongdoing.'" *Windham Solid Waste Mgmt. Dist. v. Nat'l Cas. Co.*, 146 F.3d 131, 133–34 (2d Cir. 1998) (quoting *In re Ambassador Grp., Inc. Litig.*, 830 F. Supp. 147, 155 (E.D.N.Y. 1993)). Although I find the case law inconclusive with respect to whether New York law includes the contested language as part of its definition of the term "claim" when the term is not defined in the insurance policy at issue, I note that the application of this more restrictive

14

Still, "[a] claim may be made without the institution of a formal proceeding." *Id.* (quoting *Fairchild*, 56 F.3d 439). In fact, a notice of claim provision in an insurance policy "may be triggered by an unreasonable—even sanctionable—assertion of liability." *Travelers Cas. & Sur. Co. v. Dormitory Auth.-State of N.Y.*, No. 07 Civ. 6915(DLC), 2008 WL 2567784, at *5 (S.D.N.Y. June 25, 2008) (quoting *Fairchild*, 56 F.3d at 439). As such, "'virtually any assertion of an exposure to liability within the risks covered by an insurance policy is a claim' triggering the duty to provide notice." *Id.* (quoting *Fairchild*, 56 F.3d at 439). However, "an accusation that wrongdoing occurred is not by itself a claim; nor is a threat of a future lawsuit; or a request for information or an explanation." *Windham*, 146 F.3d at 134 (citations omitted) (addressing New York law after determining that Vermont law has not defined the term "claim"). Rather, a claim must be a "specific demand for relief." *Id.* (quoting *In re Ambassador Grp.*, 830 F. Supp. at 155); *see also Weaver v. Axis Surplus Ins. Co.*, 639 F. App'x 764, 766 (2d Cir. 2016) (summary order) (noting, where policy defined claim as a demand, that "under New York law, 'a demand requires an imperative solicitation for that which is legally owed,' as distinguished from a request carrying no legal consequences" (quoting *Gil Enters., Inc. v. Delvy*, 79 F.3d 241, 246 (2d Cir. 1996))).

Here, Colony argues that the September 2013 Demand Letter only demanded the $2 million policy limit and did not demand "extra-contractual" damages beyond that amount; as such, Colony contends that the other statements in the September 2013 Demand Letter constituted a mere threat of a future claim. (Pl.'s Mem. 2.) However, the September 2013

---

definition of "claim" does not alter the outcome here.

"Def.'s Opp." refers to the Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment, filed February 17, 2017. (Doc. 52.) "Def.'s Reply" refers to the Reply Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment, filed March 3, 2017. (Doc. 55.)

15

Demand Letter contains language and assertions that support a finding that the letter made a demand for damages beyond the policy limit. For example, in the September 2013 Demand Letter, Dickerson, counsel for the Schlup Insureds, unequivocally (1) stated that if Colony persisted with its prior rejection of Schlup's request that it pay the $2 million policy limit, Schlup would affirmatively proceed with a lawsuit "to collect any excess judgment rendered at trial, which we fully expect to be in excess of $15,000,000.00;" (2) stated that the lawsuit would be for bad faith and equitable garnishment; (3) detailed the damages that would be shown by Plaza Gardens at a trial to support that expectation; (4) described the facts and circumstances that caused Schlup to conclude that Colony's actions were taken in bad faith; and (5) outlined the legal justification for the intended bad faith lawsuit. (*See generally* September 2013 Demand Letter.) Colony argues that these statements amount to a threat of litigation.

Colony is wrong. It is clear upon examining the September 2013 Demand Letter and the context in which it was written that it constituted an attempt to give Colony one final chance before actions and decisions already made by Colony—namely its August 9, 2013 denial of coverage—warranted the specific legal consequences described by Dickerson in that letter. The demands in the September 2013 Demand Letter were made after the plaintiffs in the underlying action had sent a letter to Dickerson that outlined the combined policy limits and stated that $7 million of the $9 million settlement demand had already been tendered by three other insurers. (Def.'s 56.1 ¶¶ 16–17.) In other words, settlement was essentially a fait accompli. To emphasize this point, Dickerson provided a copy of the settlement letter along with the September 2013 Demand Letter to Colony. (*Id.* ¶ 18.) Therefore, the September 2013 Demand Letter was written at a time when three other insurers had already made the determination, based upon the claims in the underlying litigation, to tender their policy limits to settle with the

16

underlying plaintiffs. This context, combined with the language of the September 2013 Demand Letter, demonstrates that the letter was not a threat of litigation but a road map for what was going to happen if Colony did not tender the policy limits.

In addition, as AIG notes, (*see* Def.'s Opp. 7; Def.'s Mem. 14),[12] the essence of the letter is the stated causes of action for bad faith and equitable garnishment, for which Schlup gave precise factual and legal justification. As a result, the September 2013 Demand Letter is a clear statement by Schlup that Colony "may be liable to it," *Travelers Indem.*, 677 F. App'x at 705 (quoting *Fairchild*, 56 F.3d at 439), and satisfies the definition of a "claim" under New York law, *see, e.g.*, *Windham*, 146 F.3d at 135 (finding that letters stating party was responsible for cost of remediation, whatever the cost would be, and demonstrating that the question was not whether there would be any relief sought, but what would ultimately be the relief, satisfied the definition of a "claim").[13]

Although Colony urges that the Policy's distinction between a "claim" and an "occurrence" renders AIG's approach untenable, (*see* Pl.'s Opp. 13–14), I find otherwise. "[A]s the Second Circuit has explained, 'a notice of occurrence requirement is treated differently under New York law from a notice of claim requirement,' because 'the term occurrence leaves room for differences of opinion as to whether a particular event is likely to lead to liability.'" *Rockland Exposition*, 746 F. Supp. 2d at 541 (quoting *Fairchild*, 56 F.3d at 439). Here, the chances that Colony would incur some liability for the actions described in the September 2013

---

[12] "Def.'s Mem." refers to the Memorandum of Law in Support of Defendant's Cross-Motion for Summary Judgment, filed January 23, 2017. (Doc. 37.)

[13] Colony argues that AIG's interpretation of the term "claim" would have "broad-reaching implications on insurance company operations," as it will burden every policyholder with providing notice on every policy limit settlement demand. (Pl.'s Opp. 19.) As an initial matter, the facts as outlined above are unique and do not equate to a garden variety policy limit settlement demand. In any event, as explained in greater detail above, I do not find that the September 2013 Demand Letter is a mere settlement demand for the insurance policy limit and, as such, do not find Colony's policy argument convincing.

17

Demand Letter was "not a 'remote possibility,' but a realistic possibility," *id.* (citation omitted) (quoting *Fairchild*, 56 F.3d at 439), further supporting the conclusion that the September 2013 Demand Letter falls properly within the definition of a "claim."

### D. *Relationship Between the September 2013 Claim and the July 2014 Claims*

"To establish that a prior Claim is interrelated with a subsequent Claim, the Claims must share a 'sufficient factual nexus.'" *Quanta Lines Ins. Co.*, 2009 WL 4884096, at *14 (citing case law). There is a "sufficient factual nexus" between two claims where those claims "'are neither factually nor legally distinct, but instead arise from common facts' and where the 'logically connected facts and circumstances demonstrate a factual nexus'" between the claims. *Id.* (quoting *Seneca Ins. Co. v. Kemper Ins. Co.*, No. 02 Civ. 10088(PKL), 2004 WL 1145830, at *9 (S.D.N.Y. May 21, 2004), *aff'd*, 133 F. App'x 770 (2d Cir. 2005)).

Here, Colony describes the July 2014 Claims as consisting of Schlup's July 23, 2014 demand that Colony pay the approximately $20 million judgment that was entered against it in the 2014 Lawsuit, as well as Colony's receipt of the garnishment complaint. (*See* Pl.'s Mem. 2–3.) As previously noted, Colony does not dispute that the 2009 Lawsuit and 2014 Lawsuit involved the same construction project. (Pl.'s Counter 56.1 ¶ 42.) Although Colony maintains that it treated the 2009 Lawsuit, the 2014 Lawsuit, and the Garnishment Action as separate actions with separate file numbers, (*id.*), Colony's claims notes indicate that it entered notes with respect to the September 2013 Demand Letter, the 2014 Lawsuit, and the Garnishment Action under claim number 222380, (Novack Decl. Ex. G). Colony's only basis for its assertion that it assigned separate file numbers to each action is an affidavit of R. Wade Vandiver, an Assistant Vice President for Complex Claims Litigation for Argo Group US, Inc., who handled the Garnishment Action. (Pl.'s Counter 56.1 ¶ 42.) However, Mr. Vandiver's affidavit is not

18

supported by any documentary evidence. (Doc. 50 ¶¶ 6–9.) In addition, Mr. Vandiver's affidavit asserts that the separate file numbers for each action were 222380, C222380, and EC222380. (*Id.*) Even if I accept that as true, each file number appears to be based on the same underlying file, suggesting that Colony viewed them as related.

Regardless of how Colony treated the actions internally, it is clear that the later actions were outlined and foreshadowed in the September 2013 Demand Letter, and that they were based on the same nexus of facts. For these reasons, the July 2014 claims are based on, or arise out of, the "Wrongful Acts" alleged in the September 2013 Demand Letter, such that the later claims are "deemed . . . Claim[s] first made prior to the inception of the" Policy.[14] *Quanta Lines Ins. Co.*, 2009 WL 4884096, at *15. Accordingly, I grant summary judgment in favor of AIG.

V. **Conclusion**

For the foregoing reasons AIG's motion for summary judgment, (Doc. 36), is GRANTED, Colony's motion, (Doc. 45), is DENIED, and this case is DISMISSED. The Clerk of Court is respectfully directed to enter judgment for AIG and close this case.

SO ORDERED.

Dated: March 26, 2018
New York, New York

Vernon S. Broderick
United States District Judge

---

[14] Colony further refers to an exclusion in the Policy that was later deleted, which stated that the Policy did not apply "to any claim arising out of any Wrongful Act occurring prior to the inception date of the first Insurance Company's Professional Liability Insurance policy . . . if on such first inception date any Insured knew or could have reasonably foreseen that such Wrongful Act could lead to a claim or suit." (Pl.'s Mem. 19–20 & n.5.) Plaintiff contends that the deletion of this exclusion necessarily means that the Policy extends coverage to "claims" that arise out of Wrongful Acts committed before the Policy incepted, even if Colony could have foreseen that this would leave to a claim or suit. (*Id.*) This argument is irrelevant, as I have found that the September 2013 Demand Letter was a *claim* that arose before the inception date of the Policy, not simply a Wrongful Act that later resulted in a claim.

19